UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x
KHALIFAH ABDUL-KHALIQ,

               Petitioner,     :     REPORT & RECOMMENDATION

                        :

         -against-       09 Civ. 2516 (SHS)(MHD)

                        :
JOSEPH T. SMITH,

                        :

           Respondent.   :
-------------------------------x

TO THE HONORABLE SIDNEY H. STEIN, U.S.D.J.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12/11/10

     Petitioner Khalifah Abdul-Khaliq seeks a writ of habeas corpus
to challenge his June 10, 2004 conviction in New York State Supreme
Court, New York County, on one count of assault in the first
degree. The court sentenced him to a determinate prison term of
fifteen years, to be followed by five years of post-release
supervision. He is currently serving that sentence at the Sullivan
Correctional Facility in Fallsburg, New York.

     Petitioner has advanced twenty-nine separate claims in his pro
se petition. He raised three of these claims -- that there was
insufficient evidence that he intended to cause serious physical
injury (a predicate for first-degree assault), that he received
ineffective assistance from his trial counsel based on his
attorney's failure to elicit certain testimony at trial and make
certain objections, and that he was the victim of "judicial

interference" during his testimony -- in his direct appeal to the Appellate Division, First Department. Following that court's affirmance of his conviction, petitioner unsuccessfully sought leave to appeal, and in doing so he raised his insufficient-evidence claim and his ineffective-assistance claim targeting his attorney's failure to elicit testimony. Petitioner is raising the remaining twenty-six claims here for the first time. Generally speaking, those claims can be broken down into eight categories. Petitioner is challenging the procedural rules governing requests for habeas relief (Pet. for a Writ of Habeas Corpus, ¶¶ 13(D)-(E), (H)-(K), (P), (R)-(S)), challenging his lack of access to appointed appellate counsel and investigative resources (Pet. ¶¶ (L)-(M), (V), (CC)), challenging his limited law-library access (Pet. ¶¶ (N), (T)-(U)), expanding his claim that he received ineffective assistance from his trial counsel to include his attorney's failure to properly investigate and preserve his claims (Pet. ¶¶ (Q), (W)), claiming that he received ineffective assistance from his appellate counsel (Pet. ¶ (BB)), alleging prosecutorial misconduct (Pet. ¶¶ (X)-(Y)), challenging the judge's instructions to the jury (Pet. ¶ (Z)), and broadening his insufficient-evidence claim (Pet. ¶¶ (F)-(G), (O), (AA)).

Respondent opposes the petition. First, he argues that the

2

state court's rejection of petitioner's insufficient-evidence claim relating to proof of his intent to cause serious physical injury and his ineffective-assistance claim targeting his attorney's failure to elicit certain evidence was consistent with United States Supreme Court precedent. (Resp't's Mem. of Law in Opp'n to the Pet. for a Writ of Habeas Corpus, 16-24). Second, he argues that petitioner's judicial-interference and related ineffective-assistance claims are unexhausted, procedurally barred and, in any event, meritless. (Id. at 11-14, 25-27). Finally, he contends that petitioner's remaining twenty-six claims are unexhausted and meritless. (Id. at 41-44).

For the reasons that follow, we recommend that the writ be denied and the petition dismissed.

## BACKGROUND

A. Underlying Events

Petitioner's conviction stems from an altercation at a Manhattan nightclub, the Supper Club, early in the morning of October 5, 2003. During the incident, petitioner cut Mr. Enold Kersaint, another nightclub patron, in the face with a razor blade.

3

Abdul-Khaliq was arrested immediately afterwards outside the nightclub, and both Kersaint and his brother identified him at the scene as the attacker. On October 24, 2003 a grand jury returned indictment number 5621/03, charging petitioner with one count of first-degree assault. (Decl. of Ass't. Atty. Gen. Leilani Rodriguez in Opp'n to Pet. for a Writ of Habeas Corpus, Ex. B at 1-2).

B. Trial

Petitioner proceeded to trial on April 19, 2004 before the Honorable Budd G. Goodman, S.J.C., and a jury. The State called as witnesses the victim, Mr. Kersaint; his brother, Mr. Karl Hippolyte[1]; Dr. Ugo Ezenkwele, who treated Kersaint in the emergency room on the morning of the incident; the manager of the Supper Club, Mr. Joseph Fishman; and New York City Police Detectives William Twachtman and James Schweiker. Petitioner testified on his own behalf. We briefly summarize the trial testimony.

---

[1] Kersaint and Hippolyte consider themselves to be brothers because they were raised in the same house, although they variously describe their actual relationship as cousins or nephew and uncle. (Tr. at 41, 118).

"Tr." refers to the transcript of petitioner's trial, which began on April 19, 2004.

4

Kersaint testified that he had driven to the Supper Club, a nightclub located on West 47th Street between Broadway and Eighth Avenue, between midnight and 1:00 A.M. on October 5, 2003. He was accompanied by his two roommates to attend a black-tie event at his sister's invitation. (Tr. at 39-41, 76, 80). At approximately 3:00 A.M. Kersaint was standing at the nightclub's bar with Hippolyte, who had arrived at the nightclub approximately an hour earlier with his girlfriend. (Tr. at 46, 120). Kersaint testified that while he was at the bar, petitioner bumped into him. (Tr. at 46-47). Kersaint said "excuse me," indicating that petitioner should apologize for bumping into him. (Tr. at 47, 121). Abdul-Khaliq refused to apologize and told Kersaint that he should expect that patrons in a busy club would occasionally bump into one another. (Tr. at 47, 51, 92). Kersaint then walked away from the bar to bring Hippolyte's girlfriend a drink. (Tr. at 47, 52, 94).

According to Hippolyte, as Abdul-Khaliq turned to walk away from the bar, he shoved Hippolyte with his arm. (Tr. at 123, 128, 153, 158-59). Hippolyte grabbed Abdul-Khaliq and pushed him away. (Tr. at 123, 128, 153-54, 159). Kersaint, having returned to the bar, inserted himself between the two men and told Abdul-Khaliq to leave the club. (Tr. at 47, 53, 96, 99, 111). Kersaint then turned to get another drink from the bar, when he felt Abdul-Khaliq slap

5

him on the left side of his face. (Tr. at 47, 53-54, 99-100. See also Tr. at 129). Abdul-Khaliq tried to get away, but Kersaint grabbed the back of his jacket and hit him. (Tr. at 47, 54, 101, 104, 110). Hippolyte testified that Abdul-Khaliq then dropped to the ground and swung at him. (Tr. at 124, 130, 160). In response, Hippolyte hit petitioner in the face. (Tr. at 124, 131, 160). When Abdul-Khaliq swung at him a second time, Hippolyte noticed that he was holding a razor. (Tr. at 124, 131).

At that point Kersaint and Hippolyte backed away from Abdul-Khaliq, and security officers arrived to escort him out of the club. (Tr. at 124, 132, 161). Once petitioner had been escorted outside, Hippolyte testified that he noticed that Kersaint's face was bleeding. (Tr. at 125, 132). He and Kersaint then left the bar to report the injury and ensure that petitioner was not allowed to leave. (Tr. at 125, 133-34). Once outside, Hippolyte saw that Kersaint had sustained a cut to his face, running from above his ear to his chin. (Tr. at 132, 134). According to Kersaint, it was not until Hippolyte told him about the injury that he realized that his face had been cut. (Tr. at 57-58).[2]

---

[2] Mr. Fishman, a manager of the Supper Club, testified that although the nightclub has security cameras, none of the cameras captured the incident involving petitioner, except for a camera in the lobby, which recorded security guards escorting patrons

The commotion outside the Supper Club attracted the attention of two New York City police detectives who had been patrolling West 47th Street in uniform on foot. (Tr. at 169-72, 190-93). The detectives placed Abdul-Khaliq under arrest, searched him and recovered a razor wrapped in black tape from his pants pocket. (Tr. at 174, 193, 195).

Dr. Ezenkwele testified that he had treated Kersaint in the emergency room of Bellevue Hospital in the morning of October 5, 2003. (Tr. at 17-18). Kersaint had a "laceration and cut to the left side of his face" that was approximately fifteen centimeters long and approximately two centimeters deep and was bleeding. (Tr. at 18-19). Dr. Ezenkwele used thirty-one sutures to close the wound. (Tr. at 24). The doctor testified that although the laceration did not cause damage to Kersaint's deep facial nerves, such as those that control eye movement, it may have caused damage to his superficial nerves, causing him to lose sensation in the area in which he was cut. (Tr. at 19). He also testified that Kersaint's face will be permanently scarred from the cut, even if he undergoes plastic surgery. (Tr. at 28). Kersaint testified that

---

from the nightclub and police officers arriving. (Tr. 212-14). During his testimony, the relevant surveillance footage was played for the jury. (Tr. 224-28).

7

since the incident the area on his face where he was cut has been tender and painful and that he still avoids contact with the scarred area. (Tr. at 63-64).

Finally, Abdul-Khaliq testified on his own behalf and gave a conflicting account of the events at the Supper Club. According to Abdul-Khaliq, he had planned a party at a nearby nightclub for the evening of October 4. Some hours later, when he heard that party promoters with whom he had collaborated on other events were holding an event at the Supper Club, he went to that nightclub at approximately 2:00 A.M. on the morning of October 5. (Tr. at 249-53). After he had been at the Supper Club for approximately an hour and a half, he was preparing to leave when he received a phone call from an acquaintance. (Tr. at 253-54). In response, he went to the bar to speak with a bartender. (Tr. at 254). Petitioner testified that while he was at the bar speaking with the bartender, Kersaint approached him and told him to say "excuse me," although Abdul-Khaliq was not aware of having bumped into Kersaint. (Tr. at 257-59, 294). He said "excuse me" twice, to which Kersaint replied that he should watch where he was going. (Tr. at 259, 295). Abdul-Khaliq responded that patrons at a nightclub were likely to bump into each other and continued speaking with the bartender. (Tr. at 259-60). As the bartender left to serve other patrons, Kersaint told

8

petitioner that he should go back to what he was doing and threatened that if he did not, Kersaint might hit him. (Tr. at 262).

As the bartender returned and Abdul-Khaliq resumed his conversation with her, he saw Kersaint nod to a man who was standing on the other side of him and holding a bottle, whom he later identified as Hippolyte. (Tr. at 263). Petitioner testified that Kersaint proceeded to sing in his ear the lyrics of a violent rap song that was playing in the nightclub. (Tr. at 264-65). After petitioner finished his conversation with the bartender, he began to walk away from the bar, when Hippolyte struck him in the back, causing him to fall into Kersaint. (Tr. at 265-66). Kersaint then grabbed him and struck him in the face. (Tr. at 266-67). At this point, petitioner testified, he reached into his pocket and realized that he had a razor, which he had used to open boxes of fliers at an event that he had organized earlier in the evening. (Tr. at 267, 271). He pulled the razor out of his pocket and swung it "wildly" in a "scratching motion" at Kersaint. (Tr. at 267-68). He was not sure whether he had hit Kersaint with the razor or not, but he proceeded to run towards the exit of the nightclub. (Tr. at 268-69). Petitioner testified that Kersaint and Hippolyte followed him, and as he was entering the lobby Kersaint grabbed him by his

9

jacket and he fell to the floor. (Tr. at 269). After he exited the nightclub, he was stopped by Detective Twachtman and his partner and arrested. (Tr. at 272, 285).

Following the parties' summations, the court submitted the charge of first-degree assault and the lesser-included offense of second-degree assault to the jury. (See Tr. at 393). At the request of defense counsel, the court also instructed the jury that the State had the burden of proving beyond a reasonable doubt that Abdul-Khaliq was not justified in slashing Kersaint's face in self-defense. (Tr. at 311-12, 397-404). The jury found petitioner guilty of first-degree assault. (Tr. at 437-38).

On June 10, 2004, Justice Goodman sentenced Abdul-Khaliq as a second-felony offender to a determinate prison term of fifteen years, to be followed by five years of post-release supervision. (S. Tr. 6-7).[3]

C. Direct Appeal

In March 2007, Abdul-Khaliq, represented by counsel, appealed

---

[3] "S. Tr." refers to the transcript of petitioner's sentencing proceeding, which took place on June 10, 2004.

his conviction to the Appellate Division, First Department. In that appeal, he raised three grounds for relief. First, he argued that the prosecution had failed to prove beyond a reasonable doubt that he had intended to cause serious physical injury, as required for a conviction of first-degree assault under New York law. (Rodriguez Decl., Ex. A at 24).[4] Second, he claimed that his trial counsel had been ineffective in not eliciting testimony from Kersaint that he had planned to file a civil lawsuit against Abdul-Khaliq and the Supper Club nightclub after the conclusion of the criminal trial. (Id., Ex. A at 27). Finally, Abdul-Khaliq argued that the trial judge's "extensive and sarcastic questioning" of him during his testimony had denied him a fair trial, and, moreover, that his attorney's failure to object to such judicial questioning amounted to ineffective assistance of counsel. (Id., Ex. A at 31).

On September 18, 2007, the Appellate Division unanimously affirmed petitioner's conviction. People v. Abdul-Khaliq, 43 A.D.3d 700, 841 N.Y.S.2d 551 (1st Dep't 2007). The court held that petitioner's intent to cause serious physical injury "could be readily inferred from his actions," and, accordingly, that the

---

[4] As part of this claim, petitioner argued that, "at the very least," his conviction for first-degree assault was against the weight of the evidence. (Id., Ex. A at 27).

11

verdict against him was based on legally sufficient evidence and was not against the weight of the evidence. Id. at 701, 841 N.Y.S.2d at 552. The court also rejected petitioner's claims of ineffective assistance of counsel, noting that they were unreviewable on direct appeal because they involved matters outside the record -- namely, his attorney's strategic reasons, if any, for not cross-examining Kersaint about his intent to file a civil action against petitioner and the Supper Club and for not objecting to the trial judge's conduct. Id.. Nonetheless, the court went on to state that, to the extent that the record permitted review of the claims, petitioner had received effective representation and that any alleged failures of counsel were not so serious as to have deprived petitioner of a fair trial. Id.. Finally, the court rejected Abdul-Khaliq's objection to the questioning by the trial judge, deeming it unpreserved, and it declined to review the claim in the interest of justice. Id.. It went on to note, however, that were it to review petitioner's claim, it would conclude that "most" of the judge's questions "constituted proper efforts at clarification," and to the extent that certain of the judge's questions were "inappropriate," the jury was not thereby prevented from arriving at an impartial verdict. Id..

Petitioner, again represented by counsel, sought leave to

12

appeal to the New York Court of Appeals and raised as grounds for appeal two of the claims that he had presented to the First Department. Specifically, he pressed the insufficiency of the evidence supporting his conviction for first-degree assault, as well as the ineffective assistance of his trial counsel in not questioning Kersaint about his intent to file a civil suit against Abdul-Khaliq and the nightclub. (Rodriguez Decl., Ex. D at 1). By order dated November 30, 2007, the Court of Appeals denied petitioner leave to appeal. People v. Abdul-Khaliq, 9 N.Y.3d 989, 989, 848 N.Y.S.2d 607, 607 (2007).

D. The Current Petition

Having been rebuffed by the state courts, Abdul-Khaliq filed a pro se habeas petition in this court on February 19, 2009. He asserted as grounds for relief all three of the claims that he had presented to the Appellate Division, as well as twenty-six additional claims that he had not raised in state court. (Pet. ¶¶ 13(A)-(CC)). Simultaneously, petitioner submitted a letter application dated February 19, 2009, requesting that the court hold his petition in abeyance to permit him to raise his newly-asserted claims in state court. (See letter to the Court from Khalifah Abdul-Khaliq, Feb. 19, 2009). We denied petitioner's stay request

by order dated May 1, 2009, noting that he had failed to make the required showing of good cause for his failure to exhaust his state-court remedies. (Order, May 1, 2009 (citing Rhines v. Weber, 544 U.S. 269, 277 (2005)).[5]

## ANALYSIS

Petitioner has articulated twenty-nine claims in support of his request for habeas relief. He raised three of those grounds on direct appeal, and the others are being asserted for the first time in the current petition.

We first address the general standards for evaluating requests for habeas relief, then discuss in turn each of petitioner's claims that he previously raised in state court and finally consider the proper disposition of the twenty-six claims that petitioner has raised here for the first time.

---

[5] Upon receiving Abdul-Khaliq's petition, but prior to receiving his letter application seeking to hold the petition in abeyance, we directed petitioner to file a memorandum of law explaining why his twenty-six newly-raised claims were not subject to an exhaustion defense. (Order, Apr. 6, 2009). Although we extended the deadline for petitioner to file such a submission at his request, he never filed such a memorandum. (See Pet'r's Notice of Mot. for Extension of Time, Apr. 21, 2009; Order, May 1, 2009; Endorsed Order, July 7, 2009). Therefore, we set a schedule for respondent to oppose the petition. (Endorsed Order, July 7, 2009).

A. Standard for Habeas Review

The stringency of federal habeas review turns on whether the state courts have passed on the merits of the petitioner's claim, that is, whether the decision of the highest state court to consider the claim is "based on the substance of the claim advanced, rather than on a procedural, or other, ground." Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001) (discussing 28 U.S.C. § 2254(d)). If the state court has addressed the merits, the petitioner may obtain relief only if the state court's ruling

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). See, e.g., Bell v. Cone, 535 U.S. 685, 693-94 (2002); Williams v. Taylor, 529 U.S. 362, 412-13 (2000); Besser v. Walsh, 601 F.3d 163, 178 (2d Cir. 2010), vacated on other grounds, Portalatin v. Graham, 2010 WL 4055571 (2d Cir. Oct. 18, 2010); Howard v. Walker, 406 F.3d 114, 121-22 (2d Cir. 2005); Brown v. Artuz, 283 F.3d 492, 497-98 (2d Cir. 2002).

15

Clearly established federal law "'refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision.'" Howard, 406 F.3d at 122 (quoting Kennaugh v. Miller, 289 F.3d 36, 42 (2d Cir. 2002)). "[A] decision is 'contrary to' clearly established federal law 'if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decided a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.'" Id. (quoting Williams, 529 U.S. at 413).

What constitutes an "unreasonable application" of settled law is a somewhat murkier proposition. "'A federal court may not grant habeas simply because, in its independent judgment, the "relevant state-court decision applied clearly established federal law erroneously or incorrectly."'" Id. (quoting Fuller v. Gorczyk, 273 F.3d 212, 219 (2d Cir. 2001) (quoting Williams, 529 U.S. at 411)). The Supreme Court observed in Williams that "unreasonable" did not mean "incorrect" or "erroneous," noting that the writ could issue under the "unreasonable application" provision only "if the state court identifies the correct governing legal principle from this Court's decisions [but] unreasonably applies that principle to the facts of the prisoner's case." 529 U.S. at 410-13. As implied by

16

this language, "[s]ome increment of incorrectness beyond error is required . . . [H]owever, . . . the increment need not be great; otherwise habeas relief would be limited to state court decisions 'so far off the mark as to suggest judicial incompetence.'" Monroe v. Kuhlman, 433 F.3d 236, 246 (2d Cir. 2006) (quoting Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000)). Accord Richard S. v. Carpinello, 589 F.3d 75, 80 (2d Cir. 2009).


As for the state courts' factual findings, under the habeas statute "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Richard S., 589 F.3d at 80-81; McKinney v. Artuz, 326 F.3d 87, 101 (2d Cir. 2003). See generally Rice v. Collins, 546 U.S. 333, 338-39 (2006).


### B. Claims That Have Been Previously Raised in State Court


#### 1. The Insufficient-Evidence Claim


Petitioner claims that there was insufficient evidence to establish that he intended to cause serious physical injury, as necessary to convict him of first-degree assault under New York

17

law. (Pet. ¶ 13(A)). Petitioner raised this claim on direct appeal, but the First Department rejected it, noting that petitioner's intent to cause such harm could be inferred from his actions. Abdul-Khaliq, 43 A.D.3d at 701, 841 N.Y.S.2d at 552. Petitioner also cited this claim as a ground for appeal in his leave application to the Court of Appeals, although that application was denied. Abdul-Khaliq, 9 N.Y.3d at 989, 848 N.Y.S.2d at 607. Respondent contends that the Appellate Division's rejection of petitioner's insufficient-evidence claim was neither contrary to, nor an unreasonable application of, Supreme Court precedent, and we agree.

To determine whether sufficient evidence was presented at trial to sustain a conviction as a matter of due process, a reviewing court must ask "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Wright v. West, 505 U.S. 277, 284 (1992) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original)). In making this determination, the court must assume that the trier of fact resolved any conflicting inferences that could be drawn from the facts in the record in favor of the prosecution. Jackson, 443 U.S. at 326.

Abdul-Khaliq was charged with first-degree assault under New York Penal Law § 120.10(1). A person commits that crime when, "[w]ith intent to cause serious physical injury to another person, he causes such injury to such person . . . by means of a deadly weapon or a dangerous instrument." N.Y. Penal Law § 120.10(1). New York courts have held that a defendant's intent to cause physical injury, including serious physical injury, can be inferred from his conduct and the type of force that he employed. See People v. Persaud, 25 A.D.3d 626, 626-27, 808 N.Y.S.2d 723, 724-25 (2d Dep't 2006) (stating that "a rational jury" can infer intent to cause serious physical injury "from the act itself as well as from the defendant's conduct and the surrounding circumstances") (citing People v. Bracey, 41 N.Y.2d 296, 301, 392 N.Y.S.2d 412, 415-16 (1977)); People v. Steinberg, 170 A.2d 50, 69, 573 N.Y.S.2d 965, 976 (1st Dep't 1991) (explaining that, when medical experts testified to the "enormity of the force" with which defendant had struck an infant, intent to cause serious physical injury "of course can be inferred from the criminal act itself as well as from the surrounding circumstances"). See also People v. Bonsu, 290 A.D.2d 251, 252, 735 N.Y.S.2d 537, 537 (1st Dep't 2002) (inferring defendant's intent to cause physical injury from defendant striking victim in the chest with a machete after a heated argument); People v. Cataquet, 234 A.D.2d 46, 46, 650 N.Y.S.2d 563, 563 (1st Dep't

19

1996) (inferring intent to cause physical injury from defendant stabbing victim in the abdomen at a distance of less than two feet after the pair had a verbal altercation); People v. Stoll, 161 A.D.2d 171, 172, 554 N.Y.S.2d 559, 559 (1st Dep't 1990) (affirming second-degree assault conviction of defendant who claimed that he displayed a razor in self-defense but accidentally cut victim, when defendant's written statement made soon after the incident did not assert that victim's injury was accidental).

In petitioner's case, there was plainly sufficient evidence introduced at trial for a reasonable juror to conclude that Abdul-Khaliq had intended to seriously injure Kersaint. Kersaint and Hippolyte testified that after Abdul-Khaliq had brief verbal and physical altercations with them, he slapped Kersaint in the face while he was holding what was later identified to be a razor. (Tr. at 47, 53-54, 96, 99-100, 123, 128-29, 153-54, 158-59). A reasonable juror, crediting Kersaint and Hippolyte's version of events, could infer that Abdul-Khaliq intended to cause serious physical injury to Kersaint when he slashed him with a razor. See People v. Walker, 30 A.D.3d 215, 215, 816 N.Y.S.2d 466, 467 (1st Dep't 2006) (holding that defendant's intent to cause serious physical injury could be readily inferred from defendant having slashed victim's face with a razor in an attempt to prevent him

20

from competing with defendant's drug-selling activities) (citing People v. Getch, 50 N.Y.2d 456, 465, 429 N.Y.S.2d 579, 583 (1980)). Thus, the state court's rejection of petitioner's insufficient-evidence claim was plainly consistent with New York law and thus cannot be deemed an unreasonable application of United States Supreme Court precedent. The claim thus does not offer a ground for habeas relief.

### 2.   Ineffective-Assistance Claim for Failure to Impeach the Accuser

Next, petitioner claims that he received ineffective assistance from his trial counsel because his attorney failed to cross-examine Kersaint about his intention to file a civil lawsuit against Abdul-Khaliq and the Supper Club at the conclusion of the criminal trial. (Pet. ¶ 13(B)). The premise for this claim is the fact that, in response to a question from the judge during a break in jury selection, Kersaint indicated on the record his intent to file such a suit. (V.D. at 249-50).[6] In his brief to the First Department, petitioner argued that Kersaint had a financial motive to fabricate his testimony in petitioner's criminal trial to enhance his prospects of success in his anticipated civil lawsuit

---

[6] "V.D." refers to the transcript of the voir dire proceedings in petitioner's trial, which began on April 19, 2004.

and that defense counsel should have alerted the jury to Kersaint's litigious intentions during his cross-examination of Kersaint. (Rodriguez Decl., Ex. A at 27-28). The Appellate Division rejected petitioner's ineffective-assistance claim, noting that to the extent that the record before it permitted review of the claim, petitioner received effective assistance and that any failings of his attorney did not render his trial unfair or cause him prejudice. Abdul-Khaliq, 43 A.D.3d at 701, 841 N.Y.S.2d at 552.[7]

---

[7] The Appellate Division also rejected petitioner's ineffective-assistance claim on the ground that it was unreviewable on direct appeal because it involved an evaluation of his attorney's strategic decisions, which turned on evidence outside the record of his trial. Id. at 701, 841 N.Y.S.2d at 552. This holding invokes a state procedural rule that requires defendants to raise grounds for appeal that are based on matters outside the record of their trial in motions to vacate their judgment pursuant to N.Y. Crim. Proc. Law § 440.10 instead of on direct appeal. See, e.g., People v. Lopez, 34 A.D.3d 599, 599-600, 824 N.Y.S.2d 173, 174-75 (2d Dep't 2006). However, rather than engage in a lengthy analysis of whether the Appellate Division's invocation of this rule constituted a denial of petitioner's claim on an independent and adequate state-law ground, thus procedurally barring him from presenting it here unless he satisfies one of two narrow exceptions, we address whether the Appellate Division's subsequent rejection of the merits of petitioner's claim, based on the record before it, comported with Supreme Court precedent. Since respondent did not argue that petitioner's ineffective-assistance claim was procedurally barred (see Resp't's Mem. at 20-24), we are particularly hesitant to reject it on such procedural grounds. In addressing whether a federal court may address sua sponte a procedural default not raised by the State, the Supreme Court has stated that it is "not aware of any precedent stating that a habeas court must raise such a matter where the State itself does not do so" and it declined to rule on whether a court is permitted to do so. Trest v. Cain, 522 U.S. 87, 89-90 (1997). See also Day v. McDonough, 547 U.S. 198, 206 (2006) (observing that

Respondent argues that this decision was neither contrary to, nor an unreasonable application of, Supreme Court precedent, and we agree.

To demonstrate a denial of the effective assistance of counsel, a petitioner must show that his lawyer's performance was "so defective that 'counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment' and that counsel's errors were 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" Brown v. Artuz, 124 F.3d 73, 79 (2d Cir. 1997) (quoting Strickland v. Washington, 466 U.S. 668, 687 (1984)). As summarized in Brown:

> To satisfy the first, or "performance," prong, the defendant must show that counsel's performance was "outside the wide range of professionally competent assistance," and to satisfy the second, or "prejudice," prong, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

Id. at 79-80 (quoting Strickland, 466 U.S. at 690, 694); accord, e.g., Smith v. Spisak, Jr., 130 S. Ct. 676, 685 (2010); Palacios v. Burge, 589 F.3d 556, 561 (2d Cir. 2009); Henry v. Poole, 409 F.3d

---

the circuit courts "have unanimously held that, in appropriate circumstances," habeas courts may examine a procedural default "on their own initiative").

48, 62-64 (2d Cir. 2005); Cox v. Donnelly, 387 F.3d 193, 197 (2d Cir. 2004).

     It bears emphasis that the Strickland standard is quite deferential and that a claim of constitutional dimension does not arise unless a lawyer's error is so egregious as to amount to a failure to provide minimal professional representation. Thus, a habeas court weighing an ineffective-assistance claim "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct," and must "determine whether, in light of all the circumstances, [counsel's] identified acts or omissions were outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690; accord, e.g., Kimmelman v. Morrison, 477 U.S. 365, 386 (1986); Loliscio v. Goord, 263 F.3d 178, 192 (2d Cir. 2001). In making this determination, "the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Strickland, 466 U.S. at 690.

     The burden of proving prejudice is equally onerous. As noted, the petitioner must demonstrate "a reasonable probability" that, but for counsel's unprofessional errors, the result of the

proceeding would have been different. "A reasonable probability is one sufficient to undermine confidence in the outcome of the trial or appeal." Aparicio v. Artuz, 269 F.3d at 95 (citing Strickland, 466 U.S. at 694).

Petitioner has a particularly high burden in showing ineffective assistance of counsel based on his attorney's manner of cross-examination. The Second Circuit has held repeatedly that "the conduct of examination and cross-examination is entrusted to the judgment of the lawyer" and should not be second-guessed "unless there is no strategic or tactical justification for the course taken." United States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998) (citing United States v. Eisen, 974 F.2d 246, 265 (2d Cir. 1992)). See, e.g., United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir. 1987) (describing the decision of counsel whether to engage in cross-examination and the extent of cross-examination as "strategic in nature"). Abdul-Khaliq fails to overcome the presumption mandated by Strickland, 466 U.S. at 689, that counsel's choice not to elicit testimony about the potential lawsuit "might be considered sound trial strategy."

Petitioner's trial counsel's decision not to question Kersaint about his plan to file a lawsuit was surely not reflective of

professional incompetence. Kersaint had contacted a lawyer about
the possibility of filing such a lawsuit but had not filed or
signed any papers, aside from an affidavit informing his attorney
about the status of the criminal trial, because he was "waiting for
this trial to be over." (V.D. at 249-50). Petitioner's counsel may
well have concluded that the possibility of a lawsuit was too
remote to persuade the jury that Kersaint was motivated to
fabricate details of the assault. Moreover, the potential for such
a lawsuit would not self-evidently undermine Kersaint's
credibility. Having unquestionably suffered a slashing injury on
the premises of the nightclub, Kersaint could necessarily be
expected to seek legal relief, and this fact would most likely have
carried little weight with the jurors.

Furthermore, counsel sought to undermine Kersaint's
credibility in other, arguably more persuasive ways during the
trial by suggesting that Kersaint had been drinking that night (Tr.
at 80-81, 84-85, 329-30), by questioning Kersaint about contact
that he had had with Hippolyte shortly before the trial (Tr. at 87-
89), by eliciting Kersaint's testimony that he "absolutely" had
intended to beat up petitioner when Abdul-Khaliq fled the bar (Tr.
at 113-14), by pointing out during summation inconsistencies
between the testimony of Kersaint and of Hippolyte regarding

details of the altercation (Tr. at 332-33), and by suggesting that the prosecutor had failed to call other eyewitnesses, such as security guards, other bar patrons, friends of Kersaint who had accompanied him that evening, and Hippolyte's girlfriend, because their testimony would have supported petitioner's version of events. (Tr. at 343). Counsel's strategy probably was to focus on these issues in order to paint a vivid picture of the events that transpired that night instead of diluting the defense with more collateral and speculative matters. The jurors were not swayed by counsel's efforts to undermine Kersaint's credibility on these matters, but we have no reason to believe that they would have changed their minds upon hearing that Kersaint might one day file a lawsuit against petitioner and the Supper Club.

Moreover, when we examine the performance of petitioner's counsel as a whole, it is clear that he defended petitioner competently and vigorously. In addition to attacking Kersaint's credibility by means more concrete than the possibility of a lawsuit, counsel painted a reasonable picture of the evening in question in which the tall, intimidating, aggressive, and somewhat intoxicated Kersaint, in tandem with Hippolyte, bullied petitioner, causing Abdul-Khaliq to fear for his life and defend himself to the extent necessary before fleeing. Counsel vigorously cross-examined

27

the prosecution's witnesses, emphasizing in particular the aggressiveness that Kersaint and Hippolyte had displayed toward petitioner by means of profanity and hostile physical conduct. (Tr. at 96-97, 98, 101-103, 153-154). Additionally, counsel attempted to discredit Hippolyte's testimony that Abdul-Khaliq had slashed at him and Kersaint more than once. During direct examination of Hippolyte, the prosecutor offered into evidence the jacket that Hippolyte had worn that night and pointed out two cuts that Hippolyte claimed had been made by Abdul-Khaliq. (Tr. at 135-36). On cross-examination, defense counsel elicited testimony that Hippolyte had given his slashed jacket to the district attorney days after the incident had taken place, thus suggesting that Hippolyte had had a chance to alter the jacket and that he was not telling the truth about the number of times that petitioner had slashed at him and Kersaint with the razor. (Tr. at 162-64, 340).

Apart from failing to satisfy the "performance" prong of the Strickland test, petitioner does not establish that his attorney's conduct caused him cognizable prejudice. The evidence in this case strongly supported the jury's verdict, and any questions that defense counsel might have posed about Kersaint's civil-suit ambitions would not have shifted the weight of the evidence in any significant manner. Kersaint described on direct examination the

28

hostile words that he had spoken to petitioner and the scuffle that had ensued after petitioner had slapped him. (Tr. at 47-48, 53-56). Hippolyte's testimony confirmed Kersaint's version of events in most regards, allowing for differences of perspective that may have suggested to the jury that the two men did not collude before the trial to match their stories. (Compare Tr. at 41, 46 with Tr. at 118, 144) (regarding the time of Hippolyte's arrival); (compare Tr. at 47, 50-51, 53 with Tr. at 121) (regarding the substance of Kersaint's conversations with petitioner); (compare Tr. at 113-14 with Tr. at 165) (regarding Kersaint's intentions toward petitioner after the slashing).

In contrast, Abdul-Khaliq offered a confused and somewhat inconsistent account that amounted to an admission that he had intentionally slashed Kersaint with a razor after Kersaint had behaved aggressively toward him and that he had continued to flail his arms wildly while still holding the razor. Apart from its confusion, this account failed to lay the basis for a viable self-defense theory.

In finding that defense counsel's performance met constitutionally-mandated levels of competence and skill and that counsel's conduct did not prejudice petitioner's right to a fair

trial, the First Department acted in accordance with Supreme Court precedent. Petitioner is not entitled to habeas relief on the grounds of ineffective assistance of counsel.


### 3. Judicial-Bias Claim


Next, petitioner has asserted a two-part argument targeting the trial judge's purportedly improper involvement in his trial. First, he claims that the judge's "excessive and sarcastic questioning" of him while he was being cross-examined by the prosecutor denied him his right to a fair trial. (Pet. ¶ 13(C)). Second, he asserts that his attorney was ineffective in "failing to object to the court's intervention." (Id). Petitioner raised this two-part claim in his appeal to the First Department. (Rodriguez Decl., Ex. A at 31-42). That court denied the claim, noting that Abdul-Khaliq's "challenges to the court's conduct of the trial [were] unpreserved" and declining to review them in the interest of justice. The court then went on to state that were it to review the challenges, it would consider "most" of the trial court's conduct to have been proper and further would find that the jury was not prevented from reaching an impartial verdict on the merits of the case based on any "inappropriate" behavior by the trial judge. Abdul-Khaliq, 43 A.D.3d at 701, 841 N.Y.S.2d at 551. As for Abdul-

Khaliq's related ineffective-assistance claim, the court determined
that, based on the record before it, petitioner received effective
assistance of counsel and that he was not prejudiced by any
purported failings of his attorney. Id..[8] Following the Appellate
Division's decision, petitioner sought leave to appeal to the Court
of Appeals but did not cite this claim as among the listed bases
for his application. (See Rodriguez Decl., Ex. D at 1 (specifying
that Abdul-Khaliq sought leave to appeal "the issues raised in
Points I and II of [his First Department] brief"). Respondent
contends that, as a result, petitioner's claim is unexhausted and
procedurally barred and further contends that it is meritless.
(Resp't's Mem. at 12-14, 25-40). We agree on both counts.


    (a) Procedural Bar


    As an initial matter, petitioner has failed to exhaust this
claim in state court, and therefore it cannot support an award of
habeas relief. Assuming that effective state processes exist to
remedy petitioner's claimed rights violation, we are authorized to

_____

        [8] As discussed above in relation to petitioner's
ineffective-assistance claim targeting his attorney's cross-
examination of Kersaint, the Appellate Division also denied the
claim on the ground that it was based on evidence outside of the
record and therefore not cognizable on direct appeal. However,
the court proceeded to dismiss the claim on its merits to the
extent that the record before it permitted review of the claim.

grant habeas relief only if the petitioner has "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b). This requires petitioner to "present his federal constitutional claims to the highest court of the state" that is capable of reviewing them, and he must do so in such a fashion that the court is "fairly appraised" of petitioner's federal constitutional claims and the factual and legal premises underlying them. Cotto v. Herbert, 331 F.3d 217, 237 (2d Cir. 2003); Grey v. Hoke, 933 F.2d 117, 119-20 (2d Cir. 1991) (citing Pesina v. Johnson, 913 F.2d 53, 54 (2d Cir. 1990) (per curiam); Morgan v. Jackson, 869 F.2d 682, 684 (2d Cir. 1989); Daye v. Attorney Gen., 696 F.2d 186, 191 (2d Cir. 1982) (en banc)). The fair-presentation requirement is only satisfied if the petitioner asserts the same legal theory, premised on essentially the same facts, in federal court as he invoked in state court. Picard v. Connor, 404 U.S. 270, 276-78 (1971); Daye, 696 F.2d at 191-92.

Here, petitioner did not include his judicial-interference and related ineffective-assistance claims among the specified grounds for appeal to the Court of Appeals when he filed his leave application, and thus he did not present them to the highest state court capable of reviewing them. That omission reflects a failure to meet the exhaustion requirement. See, e.g., O'Sullivan v.

32

Boerkel, 526 U.S. 838, 845 (1999) (holding that the exhaustion requirement mandates that state prisoners "invok[e] one complete round of the State's established appellate review process," including any discretionary review by a state high court that they are permitted).

Abdul-Khaliq's letter application identified the two grounds on which he sought review, and they did not include these claims. (See Rodriguez Decl., Ex. D at 1). Rather, he stated that there were "two reasons" that he requested permission to appeal -- namely "the issues raised in Points I and II" of his brief to the First Department, neither of which concerned his current claims. (Rodriguez Decl., Ex. D at 1). Although petitioner enclosed copies of the Appellate Division briefs with his application, as required by state court rules, see 22 N.Y. Ct. Rules § 500.20(b)[9], this does not demonstrate exhaustion. As the Second Circuit has held, even a

--------------------

[9] Part 500.20, concerning criminal leave applications in the New York Court of appeals, states:

(b) Material to be provided with application.

(1) Orders of intermediate appellate courts determining appeals to those courts. An application for leave to appeal from an intermediate appellate court order determining an appeal taken to that court shall include:

(i) one copy of each brief submitted on defendant's behalf to the intermediate appellate court.

passing reference to enclosed appellate briefs is not enough to fairly present claims to the Court of Appeals when the appellant's letter has identified the claims he wishes the Court of Appeals to review. Jordan v. Lefevre, 206 F.3d 196, 198-99 (2d Cir. 2000) (claim not presented to Court of Appeals even though petitioner sought to appeal "[f]or . . . the reasons set forth in his Appellate Division briefs" when the claim was not among those argued in preceding text of letter application). Abdul-Khaliq's letter application had no reference at all to such briefs as presenting grounds for appeal, and thus plainly cannot satisfy the exhaustion requirement. See, e.g., Grey, 933 F.2d at 120 (noting that the New York Court of Appeals does not have a "duty to look for a needle in a paper haystack" (internal quotation marks omitted)). Accord Brown v. Perlman, 2008 WL 2009220, *21-22 & nn. 36-37 (S.D.N.Y. May 8, 2008) (citing cases). Compare Galdamez v. Keane, 394 F.3d 68, 75-77 (2d Cir. 2005) (claims in appellate brief attached to letter application were fairly presented to Court of Appeals when petitioner did not specifically address any claims in the text of the letter application).

Notwithstanding Abdul-Khaliq's failure to exhaust the claims, we must deem them exhausted but subject to procedural-bar analysis because at this point he would be precluded from raising them in

state court. <u>See</u>, <u>e.g.</u>, <u>Jiminez v. Walker</u>, 458 F.3d 130, 148-49 (2d Cir. 2006) (explaining that a petitioner who has exhausted state court remedies without allowing the state courts a full opportunity to decide all of his federal claims has procedurally defaulted those claims); <u>Galdamez</u>, 394 F.3d 68 at 74 (considering procedurally defaulted those claims that the Court of Appeals would consider abandoned on the basis of petitioner's failure to identify them in his leave application); <u>Grey</u>, 988 F.3d at 120-21 (deeming exhausted those claims that petitioner failed to present in his leave application to the Court of Appeals and deeming petitioner "bar[red] from litigating the merits of those claims in federal habeas proceeding"). Petitioner may not return to the New York Court of Appeals because he is entitled to only one leave request, <u>see Spence v. Superintendent, Great Meadow Corr. Facility</u>, 219 F.3d 162, 170 (2d Cir. 2000); <u>Bossett v. Walker</u>, 41 F.3d 825, 829 (2d Cir. 1994) (citing N.Y. Ct. Rules § 500.10(a)), and in any case the time has long passed for him to seek reconsideration of the denial of his request.[10] <u>See</u> N.Y. Ct. Rules § 500.20(d).

---

[10] In theory, petitioner may be able to move under section 440.10 to vacate his conviction based on his claim of ineffective assistance of counsel regarding counsel's failure to object to the judge's purportedly inappropriate questioning, as conduct not appearing on the record. Indeed, Abdul-Khaliq stated his intention to file several state-court motions, among them a section 440.10 motion to vacate his conviction (<u>see</u> letter to the Court from Abdul-Khaliq, 2-3, Feb. 2, 2009), but we can find no

indication that he has ever filed any such motion.

The Appellate Division noted that petitioner's ineffective-assistance claim was based on evidence outside the record and therefore not cognizable by direct appeal, but the panel went on to say that, to the extent that the record permitted review, it found both claims of ineffective assistance of counsel without merit. Abdul-Khaliq, 43 A.D.3d at 701, 841 N.Y.S.2d at 551. Thus, the Appellate Division may be deemed to have decided this claim upon its merits, and section 440.10(2)(a) states that a court must deny a motion to vacate a judgment under this section when "the ground or issue raised upon the motion was previously determined on the merits upon an appeal from the judgment, unless since the time of such appellate determination there has been a retroactively effective change in the law controlling such issue."

Furthermore, petitioner cannot raise his judicial-bias claim in a section 440.10 motion because the conduct that he protests appears on the record. A court may deny a section 440.10 motion where:

> [a]lthough facts in support of the ground or issue raised upon the motion could with due diligence by the defendant have readily been made to appear on the record in a manner providing adequate basis for review of such ground or issue upon an appeal from the judgment, the defendant unjustifiably failed to adduce such matter prior to sentence and the ground or issue in question was not subsequently determined upon appeal.

N.Y. Crim. Proc. Law § 440.10(3)(a). Although the language of the statute allows for some discretion, New York courts have repeatedly held that "while an article 440 motion is designed for the purpose of developing facts dehors the trial record, this does not apply to facts that should have been placed on the record during trial." People v. Williams, 286 A.D.2d 620, 620 730 N.Y.S.2d 102, 104 (1st Dep't 2001). See also People v. Gutierrez, 57 A.D.3d 1006, 871 N.Y.S.2d 325 (2d Dep't 2008) (holding that, where defendant did not preserve a claim on the trial record, the county court should have denied under section 440.10(3)(a) the part of his section 440.10 motion pertaining to that claim).

36

We cannot grant habeas relief based on a claim that is procedurally defaulted unless petitioner either demonstrates cause for his default and prejudice or establishes that a "'fundamental miscarriage of justice'" would result from a failure to consider the claim. Schlup v. Delo, 513 U.S. 298, 314-15 (quoting McCleskey v. Zant, 499 U.S. 467, 494 (1991)); Grey, 933 F.2d at 121 (citing Murray v. Carrier, 477 U.S. 478, 492 (1986); Wainwright v. Sykes, 433 U.S. 72, 87-91 (1977)). "'[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.'" Strickler v. Greene, 527 U.S. 263, 283 n.24 (1999) (quoting Murray, 477 U.S. at 488). As for the "fundamental miscarriage of justice" test, that "rare" exception to procedural bar is reserved for "the extraordinary case" in which the petitioner can demonstrate that he was actually innocent and that the claimed error led to his conviction. Schlup, 513 U.S. at 321 (citing Murray, 477 U.S. at 496); see also Doe v. Menefee, 391 F.3d 147, 160-61 (2d Cir. 2004). Moreover, the petitioner is expected to establish actual innocence based on new evidence rather than on what was presented at trial.

_____

[10](...continued) In any event, since both parts of petitioner's judicial-interference claim are meritless, we will not discuss in detail which part of the claim is procedurally barred.

37

See, e.g., Schlup, 513 U.S. at 327, 329.


Petitioner fails to satisfy either test. He does not attempt to explain why he did not seek leave to appeal his judicial-interference and related ineffective-assistance claims, and there is no reason to believe that defense counsel was prevented from doing so.[11] In short, Abdul-Khaliq does not demonstrate cause.


He also cannot satisfy the demanding standard to demonstrate that a failure to address his claims of judicial interference and ineffective assistance would constitute a fundamental miscarriage of justice. He cannot show that he is in fact innocent; indeed, the evidence at trial was strongly indicative of guilt, and he proffers no new evidence. Finally, he plainly cannot demonstrate that any aspect of the judge's conduct led to his conviction. See infra, at

---

[11] Although a petitioner may satisfy the cause requirement by demonstrating that his attorney's default denied him constitutionally-adequate representation, Restrepo v. Kelly, 178 F.3d 634, 640 (2d Cir. 1999), he cannot invoke this ground for cause unless he has first asserted an equivalent Sixth Amendment claim in state court and exhausted his state-court remedies with respect to it. See, e.g., Edwards v. Carpenter, 529 U.S. 446, 451-53 (2000). Although Abdul-Khaliq asserted a claim for ineffective assistance of his trial counsel in state court in connection with this claim, as discussed, he did not exhaust that claim and therefore cannot rely on it to demonstrate cause for his default.

42-49.

    (b) <u>Merits</u>

    Putting aside the procedural bar to consideration of the judicial-interference and related ineffective-assistance claims, we find them to be meritless. Petitioner asserts that Justice Goodman engaged in "excessive and sarcastic questioning of [petitioner] during cross-examination" (Pet. ¶ 13(C)), which he contrasts with the judge's gentler treatment of the prosecution's witnesses. He also complains about his counsel's failure to object to the judge's conduct, which he says deprived him of a fair trial since the judge manifested disbelief of petitioner's testimony. (Pet. ¶ 13(C)), (Rodriguez Decl., Ex. A  at 34-39).

    The federal courts have long noted that the trial judge need not sit by silently during the course of a trial, but rather "may actively participate in a jury trial." <u>United States v. Bejasa</u>, 904 F.2d 137, 141 (2d Cir. 1990). As the Second Circuit has observed, the judge "need not sit like a 'bump on a log' throughout the trial." <u>Id.</u> (quoting <u>United States v. Pisani</u>, 773 F.2d 397, 403 (2d Cir. 1985). <u>Accord</u>, <u>e.g.</u>, <u>United States v. Bellomo</u>, 176 F.3d

580, 596-97 (2d Cir. 1999); United States v. Matt, 116 F.3d 971, 974 (2d Cir. 1997) (citing United States v. Leslie, 103 F.3d 1093, 1104 (2d Cir. 1997)); United States v. Mickens, 926 F.2d 1323, 1327 (2d Cir. 1991). In particular, it is perfectly appropriate for the court to ask questions in order to clarify ambiguities in the testimony, e.g., United States v. Messina, 131 F.3d 36, 39-40 (2d Cir. 1997); Matt, 116 F.3d at 974-75; United States v. Manko, 979 F.2d 900, 905 (2d Cir. 1992); United States v. 141st Street Corp., by Hersh, 911 F.2d 870, 881 (2d Cir. 1990); United States v. Gurary, 860 F.2d 521, 527 (2d Cir. 1988), or to correct misstatements by the witness, e.g., Matt, 116 F.3d at 974; Manko, 979 F.2d at 905; Pisani, 773 F.2d at 403, or to make a record for purposes of the court's own rulings. E.g., Matt, 116 F.3d at 974; Manko, 979 F.2d at 905; United States v. Mazzilli, 848 F.2d 384, 388 (2d Cir. 1988); Pisani, 773 F.2d at 403.

The appropriate limits on a trial judge's intervention in the trial are derived from the underlying principle that the court "must maintain an appearance of impartiality." United States v. Victoria, 837 F.2d 50, 54 (2d Cir. 1988). To this end, the judge, by his conduct, "should not . . . give the impression to the jury that [he] believes one version of the evidence and disbelieves or

40

doubts another." <u>Mazzilli</u>, 848 F.2d at 388. <u>See</u>, <u>e.g.</u>, <u>Messina</u>, 131 F.3d at 40; <u>Bejasa</u>, 904 F.2d at 141; <u>Victoria</u>, 837 F.2d at 55; <u>Pisani</u>, 773 F.2d at 403. Nonetheless, even when exercising its supervisory authority over the conduct of federal trials -- a process that involves a more searching review of the trial record than does habeas review of state-court proceedings for alleged constitutional error, <u>see</u>, <u>e.g.</u>, <u>Daye v. Attorney Gen.</u>, 712 F.2d 1566, 1570-71 (2d Cir 1983), the Second Circuit will not reverse a conviction based on a claim of bias unless "the [trial] judge's behavior was so prejudicial that it denied [defendants] a fair, as opposed to a perfect, trial." <u>Gurary</u>, 860 F.2d at 527 (quoting <u>Pisani</u>, 773 F.2d at 402). <u>Accord</u>, <u>e.g.</u>, <u>Bejasa</u>, 904 F.2d at 141. In making this determination, the court looks to "'the entire record'", <u>id.</u> at 141 (quoting <u>Mazzilli</u>, 848 F.2d at 389), and has repeatedly characterized the appellant's burden as "substantial." <u>E.g.</u>, <u>id.</u> at 141. <u>See</u> <u>also</u> <u>Mickens</u>, 926 F.2d at 1327 (looking for "substantial[] taint"); <u>Gayle v. Scully</u>, 779 F.2d 802, 806-07 (2d Cir. 1985).


Thus, even when the trial judge has engaged in occasional adversarial questioning of defense witnesses or has spoken sharply to an attorney, the Second Circuit has refrained from reversing a

41

conviction unless it finds clear prejudice. In justifying these holdings on a case-by-case basis, the circuit court has noted such factors as the infrequency of the inappropriate conduct, the insignificance of the testimony about which the trial judge expressed apparent skepticism, the substantiality of the evidence against the defendant, and the use of curative instructions to emphasize that the jury alone is responsible for deciding guilt or innocence. See, e.g. Messina, 131 F.3d at 40; Mickens, 926 F.2d at 1327-28 & n.1; 141st Street Corp., 911 F.2d at 881; Bejasa, 904 F.2d at 141 & n.2; United States v. Mills, 895 F.2d 897, 905-07 (2d Cir. 1990); Gurary, 860 F.2d at 527 & n.7; Pisani, 773 F.2d at 403-04.

As noted, these standards are drawn from caselaw in which the circuit court was exercising its supervisory authority over federal judges. Significantly, the extent of federal habeas review of state trial judges' conduct of criminal trials is substantially narrower. See, e.g., Daye, 712 F.2d at 1570-71. Accord, e.g., Garcia v. Warden, Dannemora Correctional Facility, 795 F.2d 5, 7-8 (2d Cir. 1986); Gayle, 779 F.2d at 813; Johnson v. Scully, 727 F.2d 222, 226 (2d Cir. 1984).

42

On its face, the "fundamental fairness" standard applied to federal constitutional claims of excessive court intervention appears quite similar to the "fair trial" supervisory review standard governing federal trials. See Daye, 712 F.2d at 1571. Moreover, the Second Circuit has observed that the constitutional standard is "somewhat ill-defined". Johnson, 727 F.2d at 226. Nonetheless, a review of the cases suggests some basic guidelines.

As noted in Daye, excessive court intervention raises two underlying concerns. First, the judge's communication of his views as to the merits poses the danger that "the jury will be deflected from a conscientious discharge of their responsibility to find the facts, apply the law, and reach a fair verdict. The jurors may believe that they should shade their judgment to accommodate the judge's view of the defendant's guilt, perhaps deferring to his view in a close case." Daye, 712 F.2d at 1571. Second, "the judge's statement creates a risk that the trial [may] not be perceived by the defendant or the public as a fair adjudication of guilt or innocence, presided over by a neutral magistrate obliged to deal evenhandedly between the contending forces of the prosecution and the defense." Id. at 1572.

43

Notwithstanding these concerns -- which also appear to govern in the non-constitutional context -- the federal courts will not overturn a state-court conviction except in fairly extreme circumstances. "A trial judge's intervention in the conduct of a criminal trial would have to reach a significant extent and be adverse to the defendant to a substantial degree before the risk of either impaired functioning of the jury or lack of the appearance of a neutral judge conducting a fair trial exceeded constitutional limits." Id.. Although not defined with geometric precision, this standard requires the court to look to both the extent of the intervention and, more importantly, its nature. Thus, even "adverse" questioning of a defense witness by a judge will not by itself demonstrate a denial of a fundamentally fair trial, "because even the most neutrally phrased questions, asked solely for clarification, may elicit answers devastating to the defendant." Id.. Furthermore even if the judge poses one or more questions "obviously intended to permit a witness to emphasize testimony helpful to the prosecution or clearly designed to challenge testimony favorable to the defense" -- an involvement that is generally considered inappropriate or "ill advised" -- this does not render a trial constitutionally unfair. Id. at 1572. See, e.g., Gayle, 779 F.2d at 806-07; Johnson, 727 F.2d at 226-27; Peterson v. Scully, 1991 WL 135621, *3-4 (S.D.N.Y. Jul. 16, 1991).

44

Petitioner does not carry the substantial burden required to show that Justice Goodman interfered with his testimony to such an extent as to undermine the fairness of the trial or the reliability of the verdict. Petitioner lists several exchanges that form the basis for his claim; the Appellate Division held that most of these involved attempts on the part of the judge to clarify petitioner's testimony, Abdul-Khaliq, 43 A.D.3d at 701, 841 N.Y.S.2d at 551, and we agree.

In the first instance cited by petitioner in his appellate brief, the judge interrupted his answer on direct examination, concerning what Kersaint had said to him, to ask whether he had bumped into Kersaint, as Kersaint had testified. (Tr. at 259). According to Kersaint, petitioner had bumped into him hard enough that Kersaint believed that Abdul-Khaliq must have been aware of the contact (Tr. at 50-51), but Abdul-Khaliq made no mention of this physical contact on direct examination when he described Kersaint as demanding that he say 'excuse me.' (Tr. at 257-59). When the judge asked petitioner whether he had bumped into Kersaint, he replied that he "wasn't aware" whether he had done so. (Tr. at 259). In view of Kersaint's prior testimony about the collision, the court's question to petitioner was a reasonable

45

attempt to clarify the circumstances that had culminated in the
altercation. Petitioner characterized the judge as asking this
question "so many times" (Rodriguez Decl., Ex. A at 35), but the
judge simply asked the question twice and then confirmed that
petitioner did not know whether he had bumped into Kersaint.


        Petitioner also complains that the judge "excessively
questioned" him about the number of times he had swung the razor.
(Rodriguez Decl., Ex. A at 35). On direct examination, the judge
interrupted petitioner to repeat defense counsel's question, asking
Abdul-Khaliq to describe the motion he had made with the razor,
after petitioner had given a long and non-responsive answer to his
own lawyer's question. (Tr. at 267-68). When petitioner answered
that he was not aware whether he had struck Kersaint, the judge
asked him whether he had hit the complainant, presumably to clarify
petitioner's ambiguous statement. (Tr. at 268). During the extended
questioning of petitioner by the judge after both attorneys had
finished examining him, the judge stated that he was interrogating
Abdul-Khaliq so closely on the issue because petitioner had
testified previously that he had recalled or believed that he had
made contact with complainant only once. According to the judge, he
wanted to clarify whether petitioner was sure that he had in fact

struck Kersaint only one time. (Tr. at 308).


The judge's questioning of petitioner regarding his use of the razor may have exceeded the bounds of strictly necessary clarification, but Abdul-Khaliq had repeatedly hedged his testimony, as the judge described. (Tr. at 268) (petitioner stating that he was not aware whether he had hit Kersaint); (Tr. at 273) (petitioner testifying that he could not explain how Hippolyte's jacket had come to be slashed because he did not remember "consciously swinging or at that time [while fleeing the nightclub] attacking anyone"); (Tr. at at 302-02) (petitioner stating that he was aware of swinging the razor only once). Furthermore, Hippolyte testified to witnessing Abdul-Khaliq swing the razor twice. (Tr. at 137). We find that, as in Daye, the judge's interrogation, which "went beyond routine clarification... [and] was detrimental to the accused, though ill-advised, was neither significantly helpful to the prosecution nor devastating to the defense." 712 F.2d at 1571.


Petitioner also objected to the judge questioning him about photographs taken after his arrest. (Rodriguez Decl. Ex. A at 36). Again, petitioner did not give clear answers in response to the prosecutor's attempts to confirm that the photographs at issue

47

accurately showed his appearance that night. He guessed that they were accurate, stated that he did not know how he had looked when the photographs were taken, repeated that the photographs possibly reflected his appearance accurately, and finally stated that his hair had been neater earlier in the evening. (Tr. at 285-89). Justice Goodman appeared to exhibit frustration with petitioner's responses, and did so in the form of sarcastic questions -- "Sir, just so there's no misunderstanding, you do remember what you looked like that night, don't you?" "Well, sir, you know what you looked like, didn't you? Is there anything different? You didn't change, did you?" (Tr. at 287, 289). Again, this series of questions, while not necessary, surely was not so consequential as to influence the views of the jurors, who were reasonably able to note Abdul-Khaliq's evasion on the subject of the photos.

The final lines of judicial questioning to which petitioner objects followed the prosecutor's inquiry as to whether Kersaint had harassed him for no reason and how petitioner had felt when Kersaint had confronted him. (Rodriguez Decl., Ex. A at 37). Defense counsel objected to the prosecutor's question about whether Kersaint and Hippolyte had harassed him "for no reason whatsoever," and the judge intervened to parse the question in a series of

simpler questions that defense counsel would presumably not find objectionable. (Tr. at 303-04). Defense counsel also objected to the prosecutor's question about whether petitioner had felt angry at Kersaint when he had first approached Abdul-Khaliq, and the judge intervened in a similar manner. (Tr. at 296-97). At one point, petitioner became confused about whose question he was supposed to respond to (Tr. at 297), and he claims in his appellate brief that the judge in both instances "assumed a prosecutorial role." (Rodriguez Decl., Ex. A at 37). The record indicates that these questions could have been left for the prosecutor to amend after defense counsel's objections, but the judge's efforts at clarification were reasonable and fair and they did not harm the defense case.

Finally, petitioner objects in general that the judge directed challenging questions solely at him and expressed sarcasm solely with respect to him. The record does not support this argument. The judge did in fact ask substantial questions of the prosecution's witnesses, particularly challenging the testimony of Dr. Ezenkwele regarding the possibility of permanent scarring and loss of sensation to the nerves at the site of Kersaint's injury, and he implicitly upheld defense counsel's objections by requesting

49

clarification. (Tr. at 19-20, 28-29). The judge also intervened during the prosecutor's direct examination of Kersaint to confirm that Kersaint was testifying that he did not realize that he had been cut until Hippolyte told him (Tr. at 57), and asked questions during direct examination of Hippolyte concerning the cut in his jacket and whether he had been aware of the damage at the time of altercation. (Tr. at 137)

Neither was the judge's sarcasm confined to petitioner. Prior to commencement of the prosecutor's direct examination of Detective Twachtman, the judge reprimanded the detective for giving his full name to the court as "Detective Twatchman," instead of stating his first name. The judge asked, "Sorry, can we start off with the fact that you have a first name?" and when the witness replied, he continued, "It is not a military secret." (Tr. at 166). He also instructed the prosecution's witness Joseph Fishman, a manager of the Supper Club, to "[p]lease tune up [his] hearing aid," when the witness misheard the judge's question regarding his county of residence. (Tr. at 202).

Nevertheless, petitioner is correct in asserting that the judge intervened more frequently during his testimony than during

50

the testimony of any other witness, and he is also correct that some of these interruptions were somewhat sarcastic. The Appellate Division noted that some of the judge's questions were "inappropriate," and we agree that some remarks could have been phrased less facetiously or omitted altogether. The judge's repeated questioning of petitioner on a few key issues was not strictly necessary to the jury's understanding of the testimony. However, we recognize that "judges are. . . only human. . . [and] [t]hey do not possess limitless ability, once passion is aroused, to resist provocation." United States v. Robinson, 635 F.2d 981, 985 (2d Cir. 1980) (quoting United States v. Weiss, 491 F.2d 460, 468 (2d Cir. 1974)). While it is true that the judge interfered more often during petitioner's testimony, it is also true that Abdul-Khaliq gave long, rambling and non-responsive answers, as well as answers containing hearsay, and that the prosecution's witnesses generally did not. (Tr. at 245, 250-51, 254, 256-57, 260-61, 267-70). The court took an active role in this case and expressed evident frustration with the petitioner, but we do not find that such remarks prevented the jury from reaching an impartial verdict.

In sum, we agree with the Appellate Division that the conduct

of Justice Goodman did not rise to the level of improper interference under the standards applicable to direct appellate review, much less the standards of federal habeas review.

C. Claims Raised for the First Time in Current Petition

As noted above, petitioner asserts twenty-six claims in his habeas petition that he did not raise on appeal in the First Department or in his leave application to the Court of Appeals. These claims are unexhausted, and petitioner offers no explanation as to why he failed to include them in previous appeals or in a motion in the state trial court. Nevertheless, because they are all plainly meritless, we will bypass the exhaustion question and address their substance. 28 U.S.C. § 2254(b)(2)[12]; see Smith v. Texas, 550 U.S. 297, 323-24 (2007) (holding that a state court may rest its decision to dismiss a habeas petition on the merits rather than on preliminary issues such as lack of preservation because, among other reasons, the public and parties may be more likely to be satisfied with a decision on the merits of a case, rather than

_____

[12] 28 U.S.C. § 2254(b)(2) states that "An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."

a technicality). We have divided petitioner's claims into eight categories. These encompass challenges to procedural rules for post-conviction relief, challenges to his lack of access to appellate counsel and investigative resources, challenges to his limited law-library access, expansions of his claim of ineffective assistance of trial counsel based on his attorney's failure to investigate and to preserve his claims, a claim of ineffective assistance of appellate counsel, allegations of prosecutorial misconduct, a challenge of the jury instructions, and expansions of his insufficient-evidence claim.

First, in response to petitioner's challenges to the procedural rules for post-conviction relief, we have already recognized that in "the extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent," a court may grant habeas relief even where a petitioner has failed to show cause for a procedural default. Murray, 477 U.S. at 496. Abdul-Khaliq does not present such an extraordinary case, nor is the foundation of petitioner's complaints entirely clear. For example, he complains of the difficulty of meeting the federal statute of limitations, but respondent agrees that his petition has been timely filed. (Pet. ¶¶

53

13(D), (H), (J); Resp. Mem. at 42). Even if Abdul-Khaliq asserted more specifically the ways in which his case was harmed by procedural rules, in order to remedy such harm he must show actual innocence by means of new evidence, of which he has offered none.


Next, petitioner complains that he is not entitled to appointed counsel for a motion to vacate his conviction under N.Y. Crim. Proc. Law § 440.10 (Pet. ¶ 13(L)) or for his habeas petition. (Pet. ¶ 13(CC)). The Sixth Amendment has been interpreted to guarantee counsel to defendants during the trial stages of their cases, see, e.g., Gideon v. Wainwright, 372 U.S. 335, 344 (1972) (holding that, in a criminal case, "any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided to him"), and the Fourteenth Amendment guarantees counsel to defendants during direct-appeal stages where a right to appeal is guaranteed by statute. See Evitts v. Lucey, 469 U.S. 387, 393-94 (1985) (stating that, where a state guarantees a right of appeal to criminal defendants, the Equal Protection and Due Process Clauses of the Fourteenth Amendment mandate a right to counsel for defendants' first appeal); see also N.Y. Crim. Proc. Law § 450.10(1).[13] Petitioner is correct that he is not

---

[13] N.Y. Crim. Proc. Law § 450.10(1) states that:

constitutionally entitled to counsel for either a collateral attack on his conviction or for a habeas proceeding. See, e.g., Heath v. U.S. Parole Com'n., 788 F.2d 85, 88 (2d Cir. 1986). That alone is sufficient to compel rejection of his claim in this proceeding. We also note that petitioner is permitted by statute to apply for appointment of counsel to represent him before the habeas court and, in fact, he has not asked this court to furnish representation to him in this case. Such a request is granted at the discretion of the court "whenever. . . the interests of justice so require" for "any person financially unable to obtain representation." 18 U.S.C. § 3006A(g). Nonetheless, as we have discussed, we find Abdul-Khaliq's petition in general to be meritless and appointed representation not required by the interests of justice.

Petitioner's challenges to his limited access to the prison

--------

An appeal to an intermediate appellate court may be taken as of right by the defendant from the following judgment, sentence and order of a criminal court:

1. A judgment other than one including a sentence of death, unless the appeal is based solely upon the ground that a sentence was harsh or excessive when such sentence was predicated upon entry of a plea of guilty and the sentence imposed did not exceed that which was agreed to by the defendant as a condition of the plea and set forth on the record or filed with the court as required by subdivision five of section 220.50 or subdivision four of section 340.20.

law library plainly do not belong in a habeas petition. The Supreme
Court has repeatedly upheld the right of a state prisoner "making
a constitutional challenge to the conditions of his prison life,"
to bring a federal civil action under 42 U.S.C. § 1983; a habeas
petition is appropriate solely for challenging the "fact or
duration of confinement." Preiser v. Rodriquez, 411 U.S. 475, 498-
99 (1973) (citing Cooper v. Pate, 378 U.S. 546 (1964); Houghton v.
Shafer, 392 U.S. 639 (1968); Wilwording v. Swenson, 404 U.S.
(1971); Haines v. Kerner, 404 U.S. 519 (1972)). Claims of denial of
access to prison law libraries fall in the category of challenges
to prison conditions and must be asserted in § 1983 lawsuits.[14] See
Preiser, 411 U.S. at 499 (explaining that a § 1983 claim is the
appropriate action for "a state prisoner who is making a
constitutional challenge to the conditions of his prison life").
See also Bounds v. Smith, 430 U.S. 817, 828 (1977) (holding that
prisoners' right of access to the courts requires providing
prisoners with access to an adequate law library; the appropriate
remedy for challenging access to such is a § 1983 claim, such as
plaintiffs brought in that case).

---

[14] We note in passing that, before commencing a § 1983
lawsuit, an aggrieved prisoner must first exhaust his prison
grievance remedies.  See 42 U.S.C. § 1997e(a) (1994 ed., Supp.
V). See also Porter v. Nussle 534 U.S. 516, 524 (2002).

Petitioner further alleges ineffective assistance of counsel on the grounds that his trial attorney failed to make reasonable investigations, extract material and exculpatory evidence from allegedly uncooperative witnesses and preserve meritorious claims on the record. (Pet. ¶¶ 13(Q), (W)). We find this claim to have no more merit than the claims of ineffective assistance of counsel that we have already addressed. We have no basis on which to judge the first two criticisms listed by petitioner because no information concerning either defense counsel's investigations or uncooperative witnesses appears on the record; neither does petitioner provide us any such information in his habeas papers. In contrast, we can look to the record to answer petitioner's third claim in this category. In fact, defense counsel vigorously objected during the trial, and petitioner could have chosen to appeal any of the trial court's adverse rulings on those objections or its failure to directly address some of them, as well as the denial of any of defense counsel's motions. (Tr. at 29, 59, 134, 139, 196, 220, 277, 278, 279, 286, 296-97, 303-04, 308, 310, 357-58, 365, 373). Insofar as we can judge defense counsel's performance on the record, we find it adequate to have guaranteed petitioner's right to a fair and impartial trial.

57

Petitioner's claim of ineffective assistance of appellate counsel, based on the attorney's failure to raise various claims of prosecutorial misconduct, is equally without merit. We have discussed the standard of habeas review for effective assistance of trial counsel, which is quite demanding. In comparison, a court's evaluation of an appellate attorney's performance is even more deferential. Appellate counsel is not required to raise every conceivable issue because "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." Jones v. Barnes, 463 U.S. 745, 751-52 (1983); see also McKee v. United States, 167 F.3d 103, 106 (2d Cir. 1999)(noting that actions or omissions by counsel that might be considered sound strategy do not constitute ineffective assistance). Thus, to establish a violation of his Fourteenth Amendment rights, Abdul-Khaliq must demonstrate that appellate counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994); accord Kalani v. United States, 2002 WL 31453094, *3 (S.D.N.Y. Oct. 31, 2002); Peterson v. Bennett, 2002 WL 1592600, *4 (E.D.N.Y. July 18, 2002).

Petitioner can make no such showing. On the contrary, appellate counsel raised three claims in the Appellate Division which had at least some support in the record. While we find that the Appellate Division decided the appeal correctly, appellate counsel presented a reasonable, well-argued brief supported by law and citations to the trial record arguing that petitioner did not receive a fair trial due to insufficient evidence, ineffective assistance of trial counsel, and judicial misconduct. In raising cognizable legal claims, as compared to the numerous complaints that Abdul-Khaliq lists in his habeas petition, appellate counsel pursued the claims most likely to grant his client some relief. Petitioner's claim for ineffective assistance of appellate counsel is therefore meritless.

Petitioner further claims that the prosecutor played her part in denying him a fair trial. Specifically, he charges that the prosecutor knowingly falsified evidence and used this false evidence to obtain a conviction. (Pet. ¶¶ 13(X), (Z)). To establish a due-process violation based on prosecutorial misconduct, a petitioner must show that in the context of the entire trial the prosecutor's conduct was so "substantially prejudicial" that petitioner was denied a fundamentally fair trial. See, e.g., Darden

v. Wainwright, 477 U.S. 168, 181 (1986); United States v. Tutino, 883 F.2d 1125, 1136 (2d Cir. 1989). Factors to be considered in determining "substantial prejudice" include "the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper statements." Floyd v. Meachum, 907 F.2d 347, 355 (2d Cir.1990); Tutino, 883 F.2d at 1137.


     Once more petitioner offers no specifics to support his claim. There is not the slightest hint in his papers as to what supposedly falsified evidence he is alluding to. Most of the trial evidence that was not witness testimony came in the form of photographs. The prosecutor also introduced the razor used in the altercation, as well as video footage from that night. The video footage showed a few minutes around the time of the altercation, and a manager of the nightclub explained that some of the original video had been edited out by an unknown person. (Tr. at 217-19). The witness testified that the portion edited out showed only crowd movement and not the altercation. (Tr. at 218-21). From what we gather from the record, the video shows very little of material significance to either the prosecution or the defense; the witness pointed out Abdul-Khaliq, Kersaint, and security guards leaving the club, but nothing of the altercation itself could be seen. (Tr. at 221-28).

60

Nothing on the record or in Abdul-Khaliq's petition suggests any improper conduct by the prosecutor in regard to this or any other piece of evidence, and certainly nothing that substantially prejudiced petitioner's right to a fair trial.

Petitioner also objects to the jury instructions given by the court, in particular the court's treatment of the justification defense and the significance of petitioner's mental state. We first note that an error in jury instructions does not generally rise to the level of a constitutional violation. See, e.g., Gilmore v. Taylor, 508 U.S. 333, 341 (1992); Estelle v. McGuire, 502 U.S. 62, 71-72 (1991). To obtain relief, the petitioner must demonstrate not only that the instruction was erroneous, "'but also that the error violated a right guaranteed to him by federal law.'" Sams v. Walker, 18 F.3d 167, 171 (2d Cir. 1994)(quoting Casillas v. Scully, 769 F.2d 60, 63 (2d Cir. 1985)). See, e.g., Cupp v. Naughten, 414 U.S. 141, 146 (1973). The error may involve a mistake in describing the elements of the crime defined by state law, if that failing was of such significance as to deprive the defendant of a fair trial, see generally Sams, 18 F.3d at 171-72 (analyzing charge under state law), or it may involve an error that is, on its face, of constitutional significance, such as misstating the burden of

61

proof, see, e.g., Sandstrom v. Montana, 442 U.S. 510, 514-15 (1979), or the meaning of "reasonable doubt." See, e.g., Sullivan v. Louisiana, 508 U.S. 275, 278 (1993). In any event, however, the petitioner must demonstrate that the erroneous instruction, viewed in the context of the entire charge, denied him a fundamentally fair trial. See, e.g., McCormick v. United States, 500 U.S. 257, 288 n.3 (1991); Cupp, 414 U.S. at 147; Gaines v. Kelly, 202 F.3d 598, 605 (2d Cir. 2000).

Even if the habeas court concludes that the trial court committed an error of that magnitude, the federal court may not grant relief if the error, in context, was "harmless." See, e.g., Estelle, 502 U.S. at 72; Rose v. Clark, 478 U.S. 570, 583 (1986); Sandstrom, 442 U.S. at 526-27 (remanding for determination of whether invalid instruction was harmless).[15] On that question, the petitioner bears the burden of demonstrating that the error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623, 638-39 (1993)(quoting Kotteakos v. United States, 328 U.S. 750, 776

---

[15] Harmless-error analysis does not apply to so-called structural errors, as distinguished from trial errors. See Rose, 478 U.S. at 576-82. Compare Sullivan, 508 U.S. at 280 (harmless-error analysis inapplicable to error in charge on reasonable doubt).

(1946)). Otherwise stated, he must show that the error resulted in "actual prejudice." Id. at 637 (quoting United States v. Lane, 474 U.S. 438, 449 (1986)).


Petitioner targets the court's instructions on the justification defense and claims that the "removal of the subjective mental state" from the jury instructions relieved the prosecutor of its burden of proving that Abdul-Khaliq was not justified in assaulting Kersaint. (Pet. 13 ¶(Z)). This argument lacks factual accuracy as well as merit. In fact, Justice Goodman discussed the meaning of "intent," an element of the crime of assault, as "a subjective element... a mental operation" which can be inferred from a person's actions, words and the relevant circumstances. (Tr. at 397). Moreover, he explained that because petitioner raised the justification defense, the prosecutor had the burden of proving that Abdul-Khaliq was not justified in using deadly physical force in self-defense. (Tr. at 398-99). Finally, the judge instructed the jury to decide whether Abdul-Khaliq reasonably believed that it was necessary for him to use deadly physical force to protect himself from serious physical injury. (Tr. at 401). Because these instructions reflected closely the definition of the justification defense found in New York Penal Law

63

§ 35.15(2)(a)[16], we find petitioner's claim to be meritless.

Finally, petitioner expands on his insufficient-evidence claim, alleging that the jury relied upon erroneous findings of law and fact to convict him and that the evidence presented did not meet the elements of the crime of which he was convicted. (Pet. ¶¶ 13(O), (AA)). We have already reviewed petitioner's evidentiary-insufficiency claim at some length and found it to be without merit. We agree with the Appellate Division that the prosecution presented ample evidence for the jury to convict petitioner.

CONCLUSION

For the reasons stated, we recommend that the writ be denied and the petition of Khalifah Abdul-Khaliq dismissed with prejudice.

---

[16] Section 35.15(2)(a) states the following:

2. A person may not use deadly physical force upon another person under circumstances specified in subdivision one unless:

(a) The actor reasonably believes that such other person is using or about to use deadly physical force. Even in such case, however, the actor may not use deadly physical force if he or she knows that with complete personal safety, to oneself and others he or she may avoid the necessity of so doing by retreating[.]

We further recommend that the court deny a certificate of appealability in the absence of any issue warranting appellate review. See Slack v. McDaniel, 529 U.S. 473, 484 (2000); 28 U.S.C. 2253(c).


Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Sidney H. Stein, Room 1010, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e); Thomas v. Arn, 470 U.S. 140, 150-52 (1985); DeLeon v. Strack, 234 F.3d 84, 86 (2d Cir. 2000) (citing Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989)).

65

Dated: New York, New York
       December 7, 2010




_____
     MICHAEL H. DOLINGER
     UNITED STATES MAGISTRATE JUDGE


Copies of the foregoing Report and Recommendation have been mailed
today to:

Mr. Khalifah Abdul-Khaliq
DIN 04-A-3417
Sullivan Correctional Facility
325 Riverside Drive
P.O. Box 116
Fallsburg, New York 12733-0116

Leilani Rodriguez, Esq.
Assistant Attorney General of the State of New York
120 Broadway, 22nd Floor
New York, NY 10271